# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

RECEIVED

APR 13 2012

AT 8:30_____M
WILLIAM T. WALSH
CLERK

MININNO LAW OFFICE
John R. Mininno, Esq. (JRM 7223)
475 White Horse Pike
Collingswood, New Jersey 08107
Tel. No. (856) 833-0600
Fax. No. (856) 833-9649
Attorney for Relator, Elizabeth Flanagan

|  |  |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF NEW JERSEY, *ex rel.*, ELIZABETH FLANAGAN, | : : : **FILED UNDER SEAL PURSUANT TO 31** : **U.S.C. §3730 and Local Rule 5.3** |
| Plaintiffs and Relator, | : : |
| v. | : **Civil Action No.:** _____ |
| DR. VISHAL BAHAL, D.O. and ADVANCED CARDIOLOGY OF SOUTH JERSEY. | : : |
| Defendants. | : **FALSE CLAIMS ACT COMPLAINT** : **JURY TRIAL DEMAND** |

## INTRODUCTION

1.     Plaintiff, Elizabeth Flanagan (the "Relator") brings this *qui tam* action on behalf of United States of America ("USA"), State of New Jersey ("the State") (the USA and the State are sometimes referred to as "the Government") pursuant to the provisions of the Federal False Claims Act, 31 U.S.C. § 3729-3733 and the False Claims Acts of the State against Defendants Dr. Vishal Bahal, D.O. and Advanced Cardiology of South Jersey ("Defendants"), to recover damages and civil penalties from the Defendants made or presented to the USA and State.

2.      These violations arise out of Defendants' knowing submission of false and fraudulent claims to the Government for healthcare program services that were either not rendered, not authorized or were otherwise not lawfully authorized to be reimbursed by the Government as is detailed below.

## FEDERAL JURISDICTION AND VENUE

3.      This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732. This Court has supplemental jurisdiction over the counts relating to the state False Claims Acts pursuant to 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, or transact business in this District. Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

5.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

## PROCEDURAL ALLEGATIONS

6.      To the extent, if any, that this case is deemed to be a "related action" and to the extent, if any, that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* FCA action pending at the time of the filing of this action, as set forth in 31 U.S.C. § 3730(e), said factual allegations in common with any pending action that would cause this case to be a "related action" are hereby expressly excluded from this action, but only to the limited extent necessary to avoid the statutory preemption.

2

7.      Furthermore, to the extent that the allegations or transactions set forth herein are subject of civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceedings exist, then the allegations or transactions referred to herein which are the subject of any such civil suit or administrative civil penalty proceedings are expressly excluded, but only for the specific time periods, specific companies, and/or specific allegations or transactions that are already the subject of the civil suit and/or administrative civil money penalty proceeding.

## PARTIES

### RELATOR, MS. ELIZABETH FLANAGAN

8.      At all times relevant and material hereto, Relator, Elizabeth Flanagan, resides in the City of Sicklerville, County of Camden, State of New Jersey, and is employed by Defendants as a Medical Assistant and Receptionist in Defendants' office in Mullica Hill, New Jersey. Relator began her employment with the Defendants on a full time basis in June, 2010.

9.      Initially, Relator's duties consisted of answering phone calls, greeting patients, collecting co-payments, and escorting patients to rooms prior to examinations.

10.      After approximately three months of employment at Advanced Cardiology of South Jersey, Relator's role in the office significantly expanded and she became more involved in the clinical operations of the business. Relator taught herself how to operate a software package known as "Chartmaker Suite", which is used in the office to electronically record medical data. After that point in time, Relator was asked to work with both electronic and paper patient charts for the duration of her employment.

11.      Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

3

12.     Relator brings this action based on her direct knowledge and, where indicated, on information and belief. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4)

## DEFENDANTS, DR. VISHAL BAHAL AND ADVANCED CARDIOLOGY OF SOUTH JERSEY

13.     Advanced Cardiology of South Jersey ("Advanced Cardiology") is owned and operated by Dr. Vishal Bahal, while his wife, Lisa Bahal, serves as the office manager. Advanced Cardiology is located at 4 Burden Lane, Suite 100, in Mullica Hill, New Jersey 08062.

14.     Dr. Vishal Bahal ("Dr. Bahal") is licensed by the American Osteopathic Board of Internal Medicine, specializing in cardiology (License Number: 25MB06965800).

15.     Dr. Bahal is affiliated with numerous hospitals, including Cooper, Salem, Underwood, Kennedy, South Jersey Regional and the University of Pennsylvania. Dr. Bahal is often called in for cardiology consultations on a regular basis. In those circumstances, Dr. Bahal frequently advises those patients to follow up in his office for further out-patient testing.

16.     Additionally, Dr. Bahal also sees patients who are referred to him from numerous family doctors in the area.

17.     Advanced Cardiology employs three medical assistants including the Relator; Sherri Buras, and Sherri (Lynette) Wray. Advanced Cardiology also employed a number of other individuals during the span of Ms. Flanagan's time with the company. These employees included Carole Ann Leavens, Kimberly Verna, Lizabeth Bittle, and Fran L/N/U.

18.     In addition, Advanced Cardiology employees a vascular technician, Steven Bomhoff.

19.     Advanced Cardiology performs a wide array of tests including Echocardiograms (ultrasound of heart while at rest); Stress Echocardiograms (ultrasound of heart both at rest and

after exercising on treadmill); EKG (electrocardiograms); Nuclear stress tests (radioactive test to study the flow of heart); Holter monitoring (patient wears a heart monitor at home to detect heart abnormalities); CV profiling (test of elasticity of arteries); and ANSAR testing (test of imbalance of nervous system).

20.     Dr. Bahal also performs numerous vascular studies including Arterial Doppler; Carotid Doppler; Venous Doppler; Aortic ultrasounds; and Renal ultrasounds.

21.     In terms of scheduling, on Mondays, the practice performs approximately 12 echocardiograms or stress echocardiograms; on Wednesday, the practice performs approximately 10 echocardiograms or stress echocardiograms; the nuclear stress tests are typically only given on Tuesdays and average about 8 per day; the ANSAR tests are given every day and the average is about 5 per day; and the vascular studies can be performed on various days but the average is approximately 80 studies per month.

22.     Stat Resources is an outside vendor assigned to perform the echocardiogram services for Advanced Cardiology.  There are two technicians from Stat Resources that primarily work for the practice.

23.     The billing, up until the week of March 23, 2012, was done through Dare Direct, a billing vendor owned by Sharon Dare. As of that date, the billing has been performed by the Defendants.

24.     Advanced Cardiology accepts private insurance in addition to Medicare and Medicaid. This medical practice deals routinely with several Medicare administrators including, but not limited to, Horizon, Aetna, and Bravo Health.

25.     At all times relevant herein, Defendants acted through its agents, employees and principals and the acts of the Defendants' agents, employees and principals were within the

scope of their agency and employment. The policies and practices alleged in this complaint were, on information and belief, set or ratified at the highest corporate levels of the Defendants.

## STATUTORY AND REGULATORY BACKGROUND

26.  Medicaid is a federal health insurance system that is administered by the states and is available to low-income individuals and families who meet eligibility requirements determined by federal and state law (herein referred to as "Medicaid beneficiaries" or "Medicaid recipients"). Medicaid pays for items and services pursuant to plans developed by the states and approved by the Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). 42 U.S.C. §§ 1396a(a)-(b). States pay health care providers according to established rates, and the federal government then pays a statutorily established share of "the total amount expended … as medical assistance under the State plan." See 42 U.S.C. §§ 1396b(a)(1).

27.  States electing to participate in the Medicaid program must comply with the requirements imposed by the Social Security Act and regulations of the secretary of the United States Department of Health and Human Services. States participating in the Medicaid program created various state Medicaid programs, waiver programs, and the like, which reimbursed healthcare practitioners, healthcare facilities, home healthcare agencies, and/or healthcare plans for rendering Medicaid-covered services to Medicaid beneficiaries.

28.  In addition to the Medicaid programs set forth above, the U.S. Department of Veteran Affairs ("Veteran Affairs"), through various programs, reimburses healthcare practitioners, healthcare facilities, home healthcare agencies and/or healthcare plans for rendering Veteran Affairs-covered services to eligible veterans and their eligible dependents.

29. The Medicare ("Medicare") program was created in 1965 as part of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, to provide a federally funded health insurance program for the aged and disabled. The United States, through the Department of Health and Human Services ("HHS"), administers the program, and has delegated the administration of the Medicare Program to the Center for Medicare Services ("CMS"), a component of HHS. Another component of HHS, the Office of Inspector General ("OIG"), is responsible for investigating Medicare fraud and abuse, as well as issuing regulations and instructions that implement the Medicare and Medicaid fraud and abuse authorities.

30. The Medicare program consists of two basic parts - Part A (42 U.S.C. §§ 1395c - 1395i-5) and Part B (42 U.S.C. §§ 1395j - 1395w-4). Part A covers all inpatient hospital services provided to eligible persons, known as Medicare beneficiaries. In addition, Part A covers certain home health services provided to Medicare beneficiaries who do not have Part B coverage. Part B provides coverage for a wide range of outpatient services, for physician and diagnostic services, for home health services for Part B eligible persons, and for durable medical equipment.

31. Medicare makes payments under Part A and Part B using private companies and insurance companies ("contractors") which provide these services under a contract with HCFA. These companies pay Medicare claims and determine the amount of reimbursable costs based on coverage and reimbursement policies established by HCFA. The companies are also responsible for identifying fraud and abuse under guidelines established by the OIG.

32. The Social Security Act provides that no Medicare payment may be made for items and services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury..." 42 U.S.C. § 1395y(a)(l)(A). Accordingly, to lawfully bill Medicare for services, the

documentation regarding such services must adequately establish reasonableness and medical necessity.

33.    The Medicaid program, Medicare program and Veteran Affairs program are collectively referred to as "Government Healthcare Programs".

## SPECIFIC ALLEGATIONS RELATED TO DR. VISHAL BAHAL, D.O. and ADVANCED CARDIOLOGY OF SOUTH JERSEY'S CONDUCT IN NEW JERSEY

### A.    UNLAWFUL DECEIVING OF PATIENTS AND/OR UNBUNDLING CHARGES

34.    Upon information and belief, Defendants have engaged in an deceitful, unlawful and fraudulent scheduling and unbundling schemes resulting in over charges to Government Healthcare Programs, including Medicare and Medicaid.

35.    The scheduling scheme, in particular, has also resulted in subordinating patient safety, health and wellbeing to Defendants profits from Governmental Healthcare programs.

36.    "Unbundling" is an unlawful practice of submitting bills piecemeal or in fragmented fashion to maximize the reimbursement for various tests and procedures that are requested to be billed together and therefore at a reduced cost.

37.    Under current law, CMS applies a multiple procedure payment reduction (MPPR) policy to the technical component (TC) of imaging services, defined as computed tomography (CT), computed tomographic angiography (CTA), magnetic resonance imaging (MRI), magnetic resonance angiography (MRA), and ultrasound services.

38.    CMS makes full payment for the TC of the highest paid procedure, but applies a 50 percent payment reduction for the technical component of the second and subsequent imaging services performed on the same patient in a single session, regardless of imaging modality and not limited to contiguous body areas.

39. Upon information and belief, this MPPR policy or another very similar policy applies to Defendants when performing studies on its patients.

40. During her initial training, Relator was taught by Dr. Bahal how to schedule patients for upcoming appointments in order to maximize Medicare reimbursements without regard to patient health and safety.

41. At that time, Dr. Bahal specifically instructed Relator that if a patient would call requiring multiple cardiovascular and/or venous studies, she was to deceive the patient and advise the patient that the tests were required to be performed on separate dates.

42. Dr. Bahal specifically told the Relator to deceive the patients by telling them "The insurance companies will not allow these tests to be performed on the same day."

43. This scheduling policy was to be implemented regardless of whether the patient had an urgent medical condition that needed immediate evaluation with several tests. Furthermore, this scheduling scheme was carried out even though there was no medical necessity for scheduling the tests in this manner.

44. When teaching Relator about this policy, Dr. Bahal explained to the Relator that he "makes more money" by deceiving by telling the patients that they are not permitted to have their testing performed on the same date because "Medicare pays more if the studies are done on different days."

45. Relator began to schedule patients consistent with this scheduling policy set forth by Dr. Bahal.

46. Notwithstanding the unlawful scheduling policy outlined above, on occasion some patients would specifically request and insist to have all of their procedures performed on the same day for convenience purposes. For example, certain elderly patients who had difficulty

9

traveling to the office. For those patients, Dr. Bahal would permit the Relator to schedule those patients to have all tests performed on the same day

47.     However, for those patients whom Dr. Bahal permitted to have tests performed on the same date, Dr. Bahal would then engage in unlawful unbundling of those tests by altering the billing records to make it appear that the testing occurred on separate dates.

48.     Defendants would then send the altered billing record in for payment and receive an unlawful increased payment from Governmental healthcare programs.

49.     Initially, Dr. Bahal specifically asked the Relater to change the billing records for such patients; but she refused to engage in this unlawful conduct.

50.     After her refusal to do so, Relator learned that Dr. Bahal was, on his own or in conjunction with other staff members, repeatedly fabricating billing records in order to make it appear as if these test were performed even though these tests were actually performed on the same date. The clear aim was increase Government Healthcare Programs reimbursements and avoid the MPPR.

51.     In total, Relator estimates that 90% of all Defendants' patients have been deceived and told that they were required to have their tests scheduled on separate dates for the sole purpose of increasing Government Healthcare Programs reimbursements. Of the remaining 10% of the patients who have their tests scheduled on a single date, Relator estimates that a high percentages of those patients have had their bills "unbundled" as detailed below in order to increase Medicare reimbursements.

52.     Since Medicare part B requires a 20% co-pay, all patients who were deceived either by being forced to make multiple appointments for test that should have been performed

on the same date or who have had their tests unbundled have been forced to incur excessive co-pay charges.

53.     Theses unlawful policy and schemes not only to Medicare patients, but to all patients that sought care from Dr. Bahal. Again, Dr. Bahal explained that this was a way to make more money and increase reimbursement rates from all insurance carriers.

54.     Dr. Bahal has engaged in unbundling of charges as outlined above on many occasions. This unlawful activity emphasizes profits as a priority above patient care and treatment.

55.     For example, Anthony H. Pauly is a patient with Medicare through Highmark Medicare Services (Policy number:148220556A) and secondary coverage through AARP (Policy number: 67649261).

56.     Mr. Pauly is an 87 year old male who was referred to Advanced Cardiology for two arterial studies: a lower extremity arterial study and a carotid study.

57.     Mr. Pauly had both studies performed on August 14, 2010, yet the billing for the studies was "unbundled."

58.     Specifically, The carotid study, procedure code: 93880, was billed for the correct date of August 14, 2010 for $700.00.  However, the arterial study, procedure codes: 93922 and 93925 was billed on August 13, 2010 for $1,100.00. In fact, the arterial study was billed for the date before it was actually performed.

59.     Upon information and belief, this practice has occurred with numerous patients as late as February, 2012.

60.     Another example is John L. Coley, an 84 year old male patient. Mr. Coley was scheduled to have two studies conducted on February 25, 2012: an Arterial Doppler study and a

Carotid Doppler study.  In addition, when he arrived at the office on February 25th, he was also given an aortic ultrasound.

61.     Each of these three studies occurred on Saturday, February 25, 2012. The carotid study, with a billing code of 93880, was billed on the correct date.  However, the arterial study, with billing codes of 93925 and 93922, was billed out for February 27, 2012 and the aortic ultrasound was also billed out for February 27, 2012.

62.     Upon information and belief, Dr. Bahal was paid by Medicare for the full rate and not the MPPR rate.

## B.     FRAUDULENT ALTERATION OF DOCUMENTS

63.     Upon information and belief, Dr. Bahal routinely attempted to alter records in order to ensure that the systematic unbundling would be consistent in both electronic and paper charts and would go undetected by auditors.

64.     Specifically, on September 27, 2010, Relator received a fax from Leprechaun, a vendor on behalf of Horizon Blue Cross Blue Shield Medicare Advantage. This fax advised Advanced Cardiology that Horizon needed to complete a random chart review of 17 patient charts.

65.     Upon receipt of the fax, Relator spoke with Dr. Bahal and advised him of the chart review request. Dr. Bahal first instructed Relator to pull the paper charts which, at that time, were still being maintained by the practice, in addition to the electronic records which were maintained in the Chartmaker Suite software.

66.     Dr. Bahal then assigned Relator the responsibility of organizing patient charts. Dr. Bahal explained that the paper charts would need to be sent to Leprechaun for purposes of the audit.

67.    However, prior to authorizing the release of the charts, Dr. Bahal instructed Relator to first review the paper charts and compare them with the billing entries which were contained in the software package to look for any discrepancies.

68.    Specifically, she was asked to review the data which was contained in the software package called Perfect Care. Perfect Care is a segment of the Chartmaker Suite, designed and utilized for both billing and appointment making. Perfect Care software interacts with the private insurance companies and government health care programs, Medicare and Medicaid, for billing purposes.

69.    On October 1, 2010, as instructed, Relator began comparing the records in the chart with the billing records. This was done to ensure that each study that had been billed had a corresponding record in the medical charts. Relator pulled each chart and stacked them on her reception desk and then went through the records one by one while taking notes of each discrepancy.

70.    While going through the charts and comparing them to the billing records, Relator began to notice that many records were either missing or did not match the billing software entries. Relator tracked each of these discrepancies in her notes.

71.    Relator brought the discrepancies to the attention of Dr. Bahal. At that time, Dr. Bahal asked Relator to unlawfully white-out the dates that had been recorded in the medical charts and re-write each date so it would match with the electronic billing data. Relator once again refused to engage in this activity.

72.    The following day, the chart audit was faxed to Leprechaun/Horizon; however, Relator is unaware whether or not these records were altered consistent with Dr. Bahal's orders.

13

73.    Following the audit, Dr. Bahal continually asked Relator to change dates on numerous occasions.

## C.    OVERSERVICING SCHEME AND CHARGING FOR MEDICALLY UNNECESSARY TREATMENT

74.    Medicare limits its coverage to expenses which are reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. 42 U.S.C.S. §1395y(a)(1)(A); 42C.F.R. §411.15(k).

75.    Under Medicare Part B, providers of services and physicians treating Medicare recipients must submit claims for reimbursements to a Medicare carrier or fiscal intermediary on a form numbered "HFCA 1500", with sufficient information to determine whether payment is due and in what amount. 42 C.F.R. §424.5(a)(5)-(6); 42 C.F.R. §424.32.

76.    Form HCFA 1500 requires a signature certifying that "the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."

77.    Upon information and belief, Defendants have systematically and routinely submitted false claims in which it is certified that there was a medical necessity for treatment that had been rendered, and for which payment was being sought, when, in fact, such treatments were not medically necessary.

78.    Irrespective of medical necessity, Dr. Bahal orders multiple unnecessary tests on most, if not all patients in order to maximize revenue. For example, Dr. Bahal will often order an echocardiogram, a stress echocardiogram, and an EKG for a cardiac patient. These unnecessary tests can then be unbundled in order to increase Medicare reimbursements.

79.    In addition, Dr. Bahal systematically schedules patients so they have testing conducted every six months to a year, which is the time permitted for Medicare reimbursements,

14

regardless of medical necessity. In order to justify or substantiate the need for this testing, Dr. Bahal will fabricate the symptoms of the patient.

80.   For example, Dr. Bahal frequently requires patients to return for a routine follow up. On many occasions, Relator would take a medical history from those patients and document that the patient had no chest pain, shortness of breath, light-headedness, dizziness, or leg swelling.

81.   Many times, the patient's condition would be unchanged from the previous visit. However, after Dr. Bahal met with the same patient, he would come out with the chart and state that the patient was experiencing cardiac symptoms in order to justify additional testing, even though moments earlier the patient had told the Relator that no such symptoms were present.

82.   Additionally, Dr. Bahal also has a policy where all new patients are routinely given a series of tests without regard to medical necessity because he expects that the tests will be approved. For example, most, if not all, new patients are given an echocardiogram, stress echocardiogram, EKG and an ANSAR test to maximize reimbursements.

83.   Similarly, Dr. Bahal has a policy of ordering multiple venous studies on all patients whether or not there is a medical necessity for these studies.

84.   Consistent with the above scheduling and unbundling schemes, these venous studies are then scheduled on different dates, or if scheduled on the same date, billed on different dates all to maximize reimbursements.

85.   Finally, in order to increase the number of tests conducted, also Dr. Bahal also has a policy that all patients who are over the age of 50 get submitted for authorization for vascular tests, whether or not the patient has any symptoms. If the carrier or Medicare approves the tests, the patients will get the venous studies.

**D.    FEW, IF ANY, OF THE VASCULAR STUDIES BILLED BY DR. BAHAL ARE ACTUALLY PERFORMED BY DR. BAHAL**

86.    Upon information and belief, Relator alleges that Advanced Cardiology has submitted false claims for reimbursement for treatments that were claimed to have been rendered by Dr. Bahal, but which were, in fact, rendered by technicians.

87.    In fact, since joining Advanced Cardiology, Relator has never seen Dr. Bahal review a vascular study.

88.    Generally, a patient will come for a scheduled appointment and be taken to a room without ever seeing Dr. Bahal. The technician, Steven Bomhoff, will then perform the study on the patient and chart his preliminary data. This data is derived from viewing the ultrasound images.

89.    Upon information and belief, Mr. Bomhoff then takes the data home and inputs it into a final formalized vascular study report.  Following Mr. Bomhoff's review, he then emails the unsigned reports to Relator.

90.    Each morning, the Relator prints out Mr. Bomhoff's reports and places them on Dr. Bahal's desk.  At that time, Dr. Bahal will swiftly sign each report without reviewing a single study and then return the reports to Relator. Dr. Bahal then instructs Relator to fax the reports to the patient's primary physician.

91.    For almost all patients who require vascular testing, Dr. Bahal does not (1) participate in the patient testing; (2) review any of the patient's images; (3)check the patient data; or (4) read the final report.

92.    Once the report is faxed to a primary physician, a bill is submitted to Medicare for Dr. Bahal's services for the study.  Upon information and belief, Dr. Bahal has engaged in this

unlawful scheme for every vascular study patient that has been treated during Relators's entire time of employment at the office.

93.   In fact, Dr. Bahal relies exclusively on Steven Bomhoff's interpretation and conclusion of the report. Dr. Bahal has even commented to Relator, on more than one occasion, that he is not able to interpret the vascular data and that he needs Mr. Bomhoff to write a summation in the event that he has to discuss the medical results of a study with a patient.

94.   Additionally, upon information and belief, Sherri Buras, who is now a medical assistant, has also performed echo testing, interpretation, and final reports similar to the fashion outlined above.

95.   For example, on certain days, Ms. Buras would be responsible for performing the echocardiograms which she would perform on a patient without Dr. Bahal being present.

96.   After she would perform the echocardiogram, the equipment would save the measurements that she had taken. The echocardiogram equipment then allowed her to generate a report based upon the data. (i.e., The system is integrated, therefore when the patient's report is initiated; the report is populated with the measurement data.)

97.   Each report contains a conclusion section where the doctor is required to interpret the image, the ultrasound, and the measurement data, (i.e., data of anatomical features of the cardiovascular system).  However, upon information and belief, Dr. Bahal's medical assistant, Sherri Buras has, for months, been authorized and instructed by Dr. Bahal to review the data and author the conclusions.

98.   The patients' echocardiogram reports were then printed and Dr. Bahal would sign off on each of them without looking at any images or measurement data; and without even reading the report.

99.    Upon information and belief, Sherri Buras has saved a list of all patients for which she performed her own full and complete echocardiograms because she was concerned about her own potential liability in acting in such a manner.

**E.    DR. BAHAL BILLS FOR HOLTER MONITORING EVEN THOUGH HE DOES NOT REVIEW THE MONITOR DATA**

100.    Approximately 10 patients per month are given a "holter monitor."

101.    The holter monitor is a 24 hour heart monitor that a patient wears at home to check for any abnormalities or arrhythmias.  The monitor records and saves the data regarding the patient's heart rate and rhythm.

102.    After the 24 hour period, the patient returns the monitor to Dr. Bahal and the data is loaded into the office's Chartmaker software. The patient's heart data is then supposed to be reviewed by Dr. Bahal to check for any abnormalities or other dangerous conditions.

103.    Upon information and belief, Dr. Bahal will submit a bill to Medicare and/or private insurance before the patient even brings the holter back.  Notwithstanding billing for the service, Dr. Bahal frequently delays by weeks or completely neglects reading the holter monitor data.

104.    For example, as of March 2012, there were approximately 40 patients whose holter monitor data had been loaded into the Chartmaker software but who had not yet had their data read by Dr. Bahal.

105.    When patients call and ask Dr. Bahal the results of whether their holter monitor were abnormal, Dr. Bahal will frequently deceive them and advise them that their holter monitor data was normal, even though he has not read the data.

**COUNT I**
**(VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(A))**

106.   Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

107.   Upon information and belief, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for services that were either not performed or were not eligible for reimbursement for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

108.   Said false and fraudulent claims were presented with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

109.   The United States relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid Defendants for these false and fraudulent claims had it known the falsity of the said claims by Defendants.

110.   As a direct and proximate result of the false and fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

WHEREFORE, Relator, Elizabeth Flanagan respectfully requests this Court to award lawful damages and attorney's fees and cost in accordance with the law.

## COUNT II
## (VIOLATION OF THE FALSE CLAIMS ACT -- 31 U.S.C. § 3729(a)(1)(B))

111.   Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

112.   These Defendants knowingly made, used, and/or caused to be made and used false documents to certify that they provided adequate care, sufficient to maintain and/or

improve the quality of life of their Medicare and Medicaid patients. These documents were false because they (1) fraudulently overstated the level of care required for patients; (2) contained falsifications; or (3) contained certifications of standards of care which were in reality substandard.

113.   On information and belief, Defendants knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

114.   Defendants' knowingly used false records or false statements were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the United States for reimbursements and benefits.

115.   Defendants' materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment for services when in fact they were ineligible or billed for ineligible services.

116.   These said false records or false statements were made, used or caused to be made or used, with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

117.   As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the FCA in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such violation of the FCA.

WHEREFORE, Relator, Elizabeth Flanagan respectfully requests this Court award lawful damages and attorney's fees and cost in accordance with the law.

## COUNT III
## (VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT -- N.J.S.A. § 2A:32C-3(a))

118. Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

119. Defendants knowingly presented, or caused to be presented, and continue to present or cause to be presented, false and fraudulent claims for payment or approval to the State of New Jersey in violation of N.J.S.A. § 2A:32C-3(a).

120. Said false and fraudulent claims were presented with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

121. The State of New Jersey relied on these false and fraudulent claims, was ignorant of the truth regarding these claims, and would not have paid defendants for these false and fraudulent claims had it known the falsity of the said claims by Defendants.

122. By virtue of the false or fraudulent claims, the State of New Jersey suffered damages and therefore is entitled to recover from Defendants treble damages under the New Jersey False Claims Act, in an amount to be proved at trial, plus a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act.

WHEREFORE, Relator, Elizabeth Flanagan respectfully requests this Court award lawful damages and attorney's fees and cost in accordance with the law.

## COUNT IV
## (VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT -- N.J.S.A. § 2A:32C-3(b))

123.   Relator incorporates by reference and re-alleges all paragraphs of this Complaint set forth above as if fully set forth herein.

124.   These Defendants knowingly made, used, and/or caused to be made and used false documents to certify that they provide adequate care, sufficient to maintain and/or improve the quality of life of their Medicare and Medicaid patients. These documents were false because they (1) fraudulently overstated the level of care required for patients; (2) contained falsifications; or (3) contained certifications of standards of care which were in reality substandard.

125.   On information and belief, Defendants knowingly made, used or caused to be made or used, false records or false statements material to the foregoing false or fraudulent claims to get these false or fraudulent claims paid and approved by the State of New Jersey, in violation of N.J.S.A. § 2A:32C-3(b).

126.   Defendants' knowingly false records or false statements were material, and on information and belief continue to be material, to the false and fraudulent claims for payments they made to the State of New Jersey for Medicaid reimbursements and benefits.

127.   Defendants' materially false records or false statements are set forth above and include, but are not limited to false claims and/or bills for payment for services that were not necessary or needed.

128.   These said false records or false statements were made, used or caused to be made or used, with Defendants' actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

129.   As a direct and proximate result of these materially false records or false statements, and the related false or fraudulent claims made by Defendants, the State of New

Jersey has suffered damages and therefore is entitled to recovery as provided by the New Jersey False Claims Act in an amount to be determined at trial, plus a civil penalty of not less than and not more than the civil penalty allowed under the federal False Claims Act.

WHEREFORE, Relator, Elizabeth Flanagan respectfully requests this Court award lawful damages and attorney's fees and cost in accordance with the law.

**MININNO LAW OFFICE**
Attorney for the Plaintiff/Relator

John R. Mininno, Esquire (JRM 7223)

Dated: 4/13/12

**JURY DEMAND**

Pursuant to Rule 38, Plaintiff demands a trial by jury on all Counts.

**MININNO LAW OFFICE**
Attorney for the Plaintiff/Relator

John R. Mininno, Esquire (JRM 7223)

Dated: 4/13/12